## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DEBRA J. HACKNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04-3204 |
| | ) | |
| CENTRAL ILLINOIS PUBLIC | ) | |
| SERVICE COMPANY d/b/a | ) | |
| AMERENCIPS | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Central Illinois Public Service Company d/b/a AmerenCIPS' (Ameren) Motion to Strike Portions of the Affidavit of Plaintiff Debra Hackney (d/e 41) and Motion for Summary Judgment (d/e 35).  Plaintiff Debra Hackney has brought this action alleging violations of the Family Medical Leave Act (FMLA), 28 U.S.C. § 2601 *et seq*.  Ameren moves to strike portions of paragraphs 5, 7, 8, 15, and 18 of Plaintiff Hackney's Affidavit.  <u>See</u> <u>Plaintiff's Response to Defendant's Motion for Summary Judgment</u>, Exh., <u>Affidavit of Debra Hackney (Hackney Aff.)</u>.  Ameren further moves for summary judgment.

For the reasons set forth below, Defendant's Motion to Strike Portions of the Affidavit of Debra Hackney is ALLOWED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment is ALLOWED.

A.    DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE AFFIDAVIT OF PLAINTIFF DEBRA HACKNEY

Defendant Ameren moves to strike portions of ¶¶ 5, 7, 8, 15, and 18 of Hackney's Affidavit pursuant to Federal Rule of Civil Procedure 56(e). Rule 56(e) requires that an affidavit be based on personal knowledge of the affiant, set forth facts admissible in evidence, and show that the affiant is competent to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(e).

Defendant moves to strike portions of the statements contained in the above paragraphs because they contain hearsay statements. First, Defendant moves to strike the following statement in ¶ 5: "Other reasons would be known to the doctor." Hackney Aff., ¶ 5. This statement is speculative because the Affiant fails to set forth sufficient basis or establish a foundation for the Affiant's knowledge. The Court therefore strikes the above statement in ¶ 5.

Second, Defendant moves to strike the following statement in ¶ 7:

"I knew that my doctor had good reason for not allowing me to [return to work] . . . ."  <u>Hackney Aff.</u>, ¶ 7.  If this statement is made for the purpose of asserting the truth of the matter asserted, this statement is hearsay under Fed. R. Evid. 801.  However, this statement may be admitted for the limited purpose of showing the Affiant's motive and intent.  <u>See</u> <u>Fed. R. Evid.</u> 803(3).

Third, Defendant moves to strike the following statement in ¶ 8: "my doctor wanted me off work until I was released."  <u>Hackney Aff.</u>, ¶ 8.  Again, this statement may be admitted for the limited purpose of showing the Affiant's motive and intent.

Fourth, Defendant moves to strike the following statement in ¶ 15: Dr. Roszhart "determined that I still had stones and needed lithotripsy . . . ." and that Dr. Roszhart "advised me of [sic] that I was to remain off work until after the post-surgery exam . . . ."  <u>Hackney Aff.</u>, ¶ 15.  This statement may be admitted for the limited purpose of showing the Affiant's motive and intent, or, if otherwise relevant, to show what the Affiant had been told by Dr. Roszhart.

Lastly, Defendant moves to strike the following statement in ¶ 18: "I was again told by Dr. Roszhart to stay off work until Tuesday, March 2,

3

2003, but was given no activity restrictions." <u>Hackney Aff.</u>, ¶ 18.  This statement may also be admitted for the limited purpose of showing the Affiant's motive and intent.

B.    <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

On or about August 6, 2001, Plaintiff Hackney began working at Ameren's Pawnee Contact Center in Sangamon County, Illinois, as a customer service representative.  She worked at Ameren until she was discharged on March 3, 2004, for allegedly misusing sick leave in violation of Ameren's sick leave policy.  Hackney's job responsibilities as a customer service representative included speaking with customers on the phone, responding to her supervisors' orders, and making copies.  Hackney worked an eight-hour shift.  At all times during her employment with Ameren, Hackney was required to abide by Ameren's sick leave policies and guidelines.  Ameren's sick leave policy stated, among other things, that:

> The sick leave allowances are provided for illnesses and recuperative periods.  Work activity of any kind or recreational activities during a period while an employee is on sick leave is an abuse of sick leave allowances and in conflict with the objectives of such sick leave allowances.  The abuse of sick leave is conduct subject to disciplinary action, including discharge.

<u>Defendant's Motion for Summary Judgment</u>, Exh. D., <u>Letter dated 2/23/01</u>.

4

At the start of her employment with Ameren, Hackney received Ameren's Employee Handbook and acknowledged that she understood the terms and guidelines set forth in the handbook.  <u>Defendant's Motion for Summary Judgment</u>, Exh. C, <u>Deposition of Debra Hackney (Hackney Dep.)</u> at 38.  She further signed a document acknowledging that she had read and understood the sick leave policy requiring employees to use the approved sick leave for its intended purposes.[1]  <u>Id.</u> at 39-

---

[1]Ameren's Employee Handbook further provided in part as follows:

USE OF PAID LEAVE TIME
FMLA leaves generally are unpaid.  Employees are permitted, although not required, to use any available vacation days during the leave.  If the leave is for the employee's own illness, employees will be required to use any available paid sick days at the beginning of the leave period.  An employee may not use paid sick leave for any FMLA-qualifying reason except for the employee's own serious health condition.  Paid vacation, personal or sick days used will be counted toward the 12 weeks of FMLA leave available in a 12-month period.

NOTICE OF INTENT TO TAKE FMLA LEAVE
Decisions whether to request or grant FMLA leave are not discretionary and are not subject to operating necessity if the absence is for a qualifying event.  If the Company has sufficient information to determine that an eligible employee's absence is for a FMLA-qualifying reason, the Company will code the absence as FMLA even if the employee does not request FMLA leave.  All employees are expected to cooperate in completing FMLA application forms, when appropriate.

NOTICE FOR UNFORESEEABLE EVENTS
When the event requiring FMLA leave is foreseeable, such as elective surgery or the birth of a child, employees are to submit a written request for such leave at least 30 days in advance.  When 30-days written notice is not possible, notice must be given as soon as practicable, ordinarily within one or two working days of learning of when the need for leave

40.  According to Ameren, all employees on sick leave must not engage in any work activity or any kind of recreational activities.  Ameren's Absence and Tardiness Guidelines also reiterated Ameren's sick leave policy.  The Guidelines stated in relevant part: "Refer to V-9 of the 'Ameren Employee Handbook', which states 'sick leave allowances are provided for illnesses and recuperative periods.'  Any employee who is on sick leave absence shall not be involved in any work activity or any kind of recreational activity during their sick leave period.  This includes weekends.  Employees who are on sick leave are expected to remain at home recuperating."  <u>Defendant's Motion for Summary Judgment</u>, Exh. E., <u>AmerenCIPs Customer Contact Center/Absence and Tardiness Guidelines</u>.

---

becomes known to the employee.  The *Application for Time Off Under FMLA* may be obtained from the employee's Personnel Supervisor, Regional Coordinating Supervisor, Administrative Services Coordinator, or Staffing and HR Planning.  If an employee fails to give 30-days advance notice for foreseeable events, with no reasonable excuse for such failure, the leave may be delayed for up to 30 days from the date notice is given.

NOTICE FOR UNFORESEEABLE EVENTS
When the event requiring FMLA leave is unforeseen, such as an accident causing a serious health condition or a sudden change in the health of an employee or family member, employees are required to notify their Supervisor, Personnel Supervisor, Regional Coordinating Supervisor, or Administrative Services Coordinator of the need for leave as soon as possible and practicable . . . .

<u>Plaintiff's Response to Defendant's Motion for Summary Judgment</u>, Exh., <u>Excerpt of Ameren's Employee Handbook</u>.

In late 2003, Hackney occasionally took leaves of absence due to health reasons, including kidney stones.  Specifically, Hackney applied for FMLA leave due to her kidney stones for the period from October 27, 2003, until October 31, 2003, but was denied due to untimely submission of required forms.  Defendant's Motion for Summary Judgment, Exh. F. FMLA forms.  She again applied for FMLA leave due to her kidney stones for the period from November 20, 2003, until November 27, 2003, and was granted leave under the FMLA.  Id.  On the advice of her doctor, Hackney underwent surgery on November 21, 2003, and was ordered to return to work on November 27, 2003.  Id.  She further applied for FMLA leave for the period from December 1, 2003, until December 3, 2003, but was denied because it was not "not covered by the doctor–instructed to return to work November 27, 2003."[2]  Id.

During the month of February 2004, Hackney frequently took leaves of absence to treat her kidney stones.  Specifically, on February 13, 2004, Hackney went to see Dr. David Roszhart, M.D., for her kidney stones.  Hackney testified that she was directed not to work by her physician until

---

[2]It is not clear whether Hackney requested this FMLA leave because of her kidney stones.

she passed the kidney stone and to call the doctor's office if she did not feel

better by February 16, 2004.  Also on that day, Hackney informed Ameren

of her physician's advice and sought time off from work.  Hackney Dep. at

44.  Hackney states in her Affidavit that Customer Service Supervisor Karen

DeFevers gave her permission to miss work.  Hackney Aff., ¶ 11; Hackney

Dep. at 44-45.

Hackney states in her Affidavit that she called DeFevers on February

16, 2004, informing DeFevers that she "had not passed the stone and was

going to the doctor."  Hackney Aff., ¶ 12.  On February 17, 2004, Hackney

went to see Dr. Roszhart, at which time she was told that she would need

to undergo a medical procedure on either February 19 or 20, 2004.[3]

Hackney testified in her deposition that she gave notice to her supervisor

regarding her physician's advice.  Hackney Dep. at 45.  On February 19,

2004, Hackney underwent an out-patient procedure, cystoscopy, for her

kidney stones.[4]  Id. at 30.  According to Hackney, cystoscopy, "involves

---

[3]The actual medical procedure was on February 19, 2004.  See Plaintiff's
Response to Defendant's Motion for Summary Judgment, Exh., Dr. Roszhart's
Operation note dated 2/19/04.

[4]While Defendant Hackney testified that she underwent a procedure called
"lithotripsy" on February 19, 2004, Dr. Roszhart's report indicate that Hackney
underwent "Cystoscopy with left retrograde."  Plaintiff's Response to Defendant's
Motion for Summary Judgment, Exh., Dr. Roszhart's operation report dated 2/19/04.

putting a tube up [the] urethra and into [the] bladder to capture the [kidney] stone." <u>Hackney Aff.</u>, ¶ 13.  After the surgery, Hackney went home and rested because she was in a lot of pain.  <u>Id.</u>  Hackney states in her Affidavit that "[o]ver the course of the next week [she] recovered and was able to do more and more, and although [she] had much help around the house, etc from [her] family, [she] was increasingly able to run errands." <u>Id.</u> at ¶ 14.

On February 24, 2006, Hackney again went to see Dr. Roszhart, at which time Dr. Roszhart advised her that she would need to undergo a procedure called "lithotripsy" to treat her kidney stones on February 27, 2004.  Hackney states in her Affidavit that she informed DeFevers of her physician's advice and told DeFevers that she would not be able to return to work until the post-surgery follow-up on March 2, 2003.  <u>Hackney Aff.</u>, ¶ 15; <u>Hackney Dep.</u> at 33.

Also on February 24, 2004, while on sick leave, Hackney was observed by one of her co-workers, Karyl Bost, at the Christian County Courthouse.  Bost and Hackney spoke to each other, and Hackney told Bost that she was at the courthouse to pay a traffic ticket incurred by her family member.  <u>Hackney Dep.</u> at 28-29.  Hackney stated in her deposition that

she later learned from Pam Devall, another employee at Ameren, that when Bost returned to work that day, Bost told Hackney's supervisor that she had seen Hackney at the courthouse and that Hackney appeared to be fine.  <u>Id.</u> at 30-31.  Hackney does not dispute that she was at the courthouse but she testified that she was still feeling sore that day from her surgery on February 19, 2004, and was in pain from the kidney stones that had not been removed.  <u>Id.</u> at 32.

Upon being informed that Hackney was at the courthouse paying a traffic ticket while on sick leave, DeFevers and Managing Supervisor Steven Brophy became concerned that Hackney was violating the company's sick leave policy requiring employees to use sick leave only for its intended purpose, i.e., for illness or for recuperative period.  <u>Defendant's Motion for Summary Judgment</u>, Exh. H, <u>Affidavit of Karen DeFevers (DeFevers Aff.)</u>, ¶ 5.  DeFevers and Brophy decided to investigate the matter further by hiring a private investigator to conduct surveillance of Hackney to see whether Hackney was, in fact, abusing the company's sick leave policy.  <u>Id.</u>

In that effort, Ameren hired Robinson & Company, Inc. (the Robinson Group), a private investigation company, to observe Hackney on February 26, 27, and March 1, 2004.  An investigator from the Robinson

Group also took video footage of some of the activities that Hackney engaged in during the days she was observed.  Based on the surveillance, Brian Gascoigne, a Field Investigator and Team Leader with the Robinson Group, drafted an eight-page report detailing the activities that Hackney engaged in during the days she was observed.  Defendant's Motion for Summary Judgment, Exh. J, Affidavit of Brian Gascoigne (Gascoigne Aff.), ¶ 6.

On February 26, 2004, an investigator from the Robinson Group observed Hackney driving a gold Bravada and going to the following stores: Family Dollar, Ace Hardware, Taco Gringo, and Bottoms Up Lounge. Bottoms Up Lounge is Hackney's family-owned tavern.  The investigator entered Bottoms Up Lounge and observed Hackney sitting at the bar, walking around, and conversing with people.  Hackney concedes in her Affidavit that she ran some errands that day, including going to Bottoms Up Lounge to get money from her husband and picking up her prescriptions; she, however, states that she spent most of her day at home.[5]  Hackney Aff.,

---

[5]The investigation report indicates that the investigator arrived at Hackney's residence at around 6:40 a.m.  At 9:00 a.m., the investigator discovered that Hackney was not at her house.  Hackney arrived home at around 10:40 a.m.  She then left her house around 12:36 p.m., and did not come back until 6:15.  Hackney remained at Bottoms Up Lounge from approximately 2:30 p.m. until 6:15 p.m.

¶ 16.

On February 27, 2004, the day of her surgery, Hackney attested that she met her husband at Battery Specialists in Taylorville early in the morning, and after parking one of their vehicles, Hackney and her husband drove to Springfield, Illinois, to go into surgery around 6:30 a.m. Once they arrived, they were informed that the surgery had been postponed until 11:30 a.m. that day. Thereafter, they returned to Taylorville. Hackney attested that before her 11:30 a.m. surgery, she ran some errands. Indeed, the investigator observed Hackney again go to Bottoms Up Lounge. The investigator also observed Hackney go to the National Bank of Taylorville, McDonald's, Battery Specialists and Golf Cars. Hackney then went back to Springfield and underwent lithotripsy for her kidney stones.

Hackney attested that on March 1 and 2, 2004, she was still sore from the procedure she underwent on February 27, 2004, and was "passing blood and hunks of kidney stone[s]." Hackney Aff., ¶ 19. She, however, attested that she was able to run errands. Id. In fact, on March 1, 2004, the investigator observed Hackney go to the following places: (1) Casey's General Store at approximately 7:44 a.m.; (2) the Body Shop, a tanning and fitness salon, at approximately 7:53 a.m.; (3) Bottoms Up Lounge at

approximately 9:07 a.m.; (4) First National Bank in Taylorville at approximately 9:24 a.m.; (5) Christian County Courthouse at approximately 9:38 a.m; (6) Medicine Shop at approximately 9:44 a.m; (7) U.S. Post Office at approximately 9:50 a.m.; (8) Dollar General at approximately 9:57 a.m.; and (9) Bottoms Up Lounge at approximately 10:22.  Defendant's Motion for Summary Judgment, Exh. J, Surveillance Report.  Hackney remained at the lounge until 12:30 p.m., and then went home.  Hackney then came back to the lounge at approximately 1:20 p.m., and remained there until 2:29 p.m.  At around 2:34 p.m, Hackney and her husband went to an automated teller machine and then returned home around 2:57 p.m. No further activities were observed by the investigator on that day. Hackney states in her Affidavit that she " needed to and went to the Body Shop (a spa in Taylorville, Illinois) for a massage to ease the tension and pain in [her] back."  Hackney Aff., ¶ 19.

Hackney testified that on March 2, 2004, she went to the specialty clinic for her doctor's appointment, during which time she was told that her return-to-work date would be the following day.  Hackney Dep. at 50.  The record is devoid of any return-to-work slip issued by Dr. Roszhart, other than the one dated March 2, 2004.  It appears that the slip was issued

because Hackney requested one based on the following reason noted on the message slip: "PT DOES NOT FEEL LIKE GOING BACK TO WORK YET/IS SUPPOSED TO [sic] BACK TODAY/NEEDS TO CALL IN ASAP TO WORK." Plaintiff's Response to Defendant's Motion for Summary Judgment, Exh. Message slip dated 3/2/04.

On March 3, 2004, Hackney returned to work. After consulting with Ameren's Human Resources and Security Departments, DeFevers and Brophy decided to terminate Hackney's employment. Thus, when Hackney returned to work, DeFevers and Brophy called Hackney into a conference room and informed her that she was fired for abusing Ameren's sick leave policy.

For her absences in February and March 2004, Hackney did not specifically assert that she wanted her leave to be classified as FMLA leave. Ameren requires employees requesting leave under the FMLA to submit a medical certification from a health care provider. Hackney was aware of this policy as she had previously submitted medical certification in connection with her request for FMLA leave due to kidney stones. Indeed, Hackney testified in her deposition that when she previously had notified Ameren of her need to take leave due to health reasons, Ameren normally mailed her

a FMLA-packet.  Hackney Dep. at 46-47.

DeFevers states in her Affidavit that it is Ameren's general practice to mail FMLA-packets to employees on sick leave for three consecutive days or on sick leave for a potentially FMLA-qualifying event.  DeFevers Aff., ¶ 9.  DeFevers further states that the "employee has twenty (20) days to obtain the certification and to return the FMLA forms to Ameren's Human Resources Department."  Id.  DeFevers also states that Ameren's business records, to which she has access as a supervisor, show that Hackney was mailed at least one FMLA-packet, which included a medical certification form, in February 2004.[6]  Hackney denies this.  She testified that she never received a FMLA-packet from Ameren during the month of February.  At her deposition, when asked what other steps she took to have her absences in February be designated as FMLA leave, Hackney testified:

> A.  Basically I -- I called the supervisors when I -- when I had doctor appointments.  They -- My

---

[6]The Court notes that DeFevers has submitted a printout of a computer screen which is attached to her Affidavit.  DeFevers claims that the printout shows when the FMLA-packet was sent to Hackney in February 2004.  Defendant's Motion for Summary Judgment, Exh. H, Attachment to DeFevers' Affidavit (Computer printout form).  The Court, however, cannot ascertain from this printout whether Ameren had actually mailed the packet to Hackney in February 2004.  The Court further notes that Defendant Ameren has failed to provide any information on what the FMLA-packet contained.  As to the content of the FMLA-packet, Defendant has merely stated that the FMLA-packet contained a medical certification form.

understanding they in turn contact human resource
and the paperwork is sent out.  I didn't give it any
thought that I had not received the paperwork.

Q.  But you knew from prior occasions that the
paperwork for the FMLA leave to be designated had
to be turned in within a certain period of time,
right?

* * * *

A.  I didn't miss the paperwork.  I had not realized that
it had not been sent out and I had filled out papers
for the same illness prior.

Hackney Dep. at 47.

Hackney has filed a Complaint (d/e 1) against Defendant Ameren

alleging violations of FMLA, 28 U.S.C. § 2601, et seq.  Defendant now

moves for summary judgment on the grounds that Hackney can neither

prevail on her FMLA retaliation claim nor on her substantive rights

interference claim under the FMLA.  For the reasons cited, infra,

Defendant's Motion for Summary Judgment is ALLOWED.

## ANALYSIS

At summary judgment, the movant must present evidence that

demonstrates the absence of a genuine issue of material fact.  Celotex Corp.

v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the

evidence presented in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the moving party has produced evidence showing that it is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When viewed in the light most favorable to Hackney, Defendant is entitled to summary judgment.

### i.   FMLA RETALIATION CLAIM

Defendant Ameren argues that Hackney cannot prevail on her FMLA retaliation claim.  Hackney concedes that she cannot establish a FMLA retaliation claim.  As such, Defendant is entitled to summary judgment on Hackney's FMLA retaliation claim.

### ii.   FMLA SUBSTANTIVE RIGHT INTERFERENCE CLAIM

It is a violation of the FMLA if an employer interferes with substantive statutory rights guaranteed under the FMLA.

> The [FMLA] provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act.  29 U.S.C. § 2612(a)(1).  After the period of qualified leave expires, the employee is entitled to be

17

reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave.  29 U.S.C. § 2614(a).  To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided."  29 U.S.C. § 2615(a)(1).

King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999).

An employee alleging that her employer interfered with her substantive rights under the FMLA must "'establish[], by a preponderance of the evidence, that [s]he is entitled to the benefit [s]he claims.'"  Kohls v. Beverly Enterprises Wisconsin, Inc., 259 F.3d 799, 804 (7th Cir. 2001) (quoting Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 713 (7th Cir. 1997)).  Proof of discriminatory or retaliatory intent is not relevant to prove that the employer interfered with the employee's FMLA rights; the employee simply needs to prove that the employer denied the employee her entitlements under the FMLA.  Kauffman v. Federal Express Corp., 426 F.3d 880, 884 (7th Cir. 2005).

To take leave under the FMLA, an employee must first notify the employer of her need for FMLA leave.  Price v. City of Fort Wayne, 117 F.3d 1022, 1026 (7th Cir. 1997).  The regulations state that the employee does not have to expressly state that she is requesting FMLA leave, only that

leave is needed.   29 C.F.R. § 825.303(b).   "[I]t is the employer's responsibility to determine the applicability of the FMLA and to consider requested leave as FMLA leave."   Price, 117 F.3d at 1026.   Under the FMLA, the employer always has the burden "to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee."   Id. (quoting 29 U.S.C. § 825.208(a)).   Upon being notified of the employee's need for leave, the employer may request that the employee submit medical certification by a health care provider.   29 U.S.C. § 2613(a). If the employee fails to provide medical certification in a timely manner, "the employer may delay the employee's continuation of FMLA leave.   If the employee never produces the certification, the leave is not FMLA leave." 29 C.F.R. § 825.311(b).   The regulations provide that once an employee informs the employer of the need to take FMLA leave, the employer is obligated to provide "specific written notice of the employee's obligations, including the duty to provide medical certification and the consequences for failing to do so."   Perry v. Jaguar of Troy, 353 F.3d 510, 514 (6th Cir. 2003) (citing 29 C.F.R. § 825.301(c)(2)).

Defendant argues that Hackney never took the necessary steps to request or submit medical certification forms in connection with her

February and March 2004 absences.   However, it is clear that it was Defendant's burden to request medical certification from Hackney, regardless of Hackney's awareness of such a requirement from her previous experience submitting medical certification forms in connection with her request for FMLA leave due to kidney stones.

Defendant next argues that it met its burden because, at least on two occasions in February 2004, it mailed Hackney a FMLA-packet, which included a medical certification form.   Hackney denies this; she testified that she never received FMLA-packets during the month of February. Viewing the evidence in the light most favorable to Hackney, there are issues of fact as to whether Defendant Ameren adequately provided notice to Hackney regarding the certification requirement and the consequences of failing to satisfy the requirement.

To trigger the protections under the FMLA, Hackney must further show that she suffered from a "serious health condition" within the meaning of the FMLA.   The regulations define a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . .  [c]ontinuing treatment by a health care provider . . . [which] includes any one or more of the following":

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physicians's assistant . . . ; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

* * * *

29 C.F.R. § 825.114 (a)(2).

The record of evidence shows that Hackney sought continuing medical treatment for her kidney stones from Dr. Roszhart and took leaves of absence to treat the medical condition from at least February 13, 2004, until March 2, 2004.[7]  It is undisputed that Hackney also underwent surgery on February 19, 2004, and February 27, 2004.  Accordingly, she was absent from work for more than three consecutive days and was under the

_____

[7]The Court notes that Hackney has not provided any affidavit from Dr. Roszhart attesting to Hackney's medical condition.  Hackney has, however, submitted notes from Dr. Roszhart describing and outlining the medical treatment she received for her kidney stones during the following days: (1) February 13, 2004; (2) February 17, 2004; (3) February 19, 2004; (4) February 24, 2004; and (5) February 27, 2004.  See Plaintiff's Response to Defendant's Motion for Summary Judgment, Exh. Dr. Roszhart's medical notes.  She also has personal knowledge that she went to Dr. Roszhart and was treated for her kidney stones.

continuing care of Dr. Roszhart to remove her kidney stones.

However, issues of fact remain as to whether Hackney suffered from a serious health condition that rendered her unable to perform her work and to engage in daily activities. Hackney testified that, while she was on sick leave, she was able to run errands, even though she was experiencing pain and soreness. Hackney also states in her Affidavit that, over the course of the following week after her cystoscopy surgery on February 19, 2004, she "was able to do more and more, and although [she] had much help around the house, etc from [her] family, [she] was increasingly able to run errands." Hackney Aff., ¶¶ 13-14. The private investigator from the Robinson Group also observed Hackney run numerous errands while on sick leave, including spending time at her family-owned tavern and going to McDonalds, a spa, a bank, a hardware store, and the post office, on the days she was observed. At the very least, there are issues of fact as to whether these activities Hackney engaged in while on sick leave demonstrate that she did not suffer from a "serious health condition" that rendered her unable to engage in daily activities.[8]

---

[8]Defendant cites to Haefling v. United Parcel Service Inc., for the proposition that Hackney's ability to run numerous errands during her sick leave demonstrate that she was not suffering from a "serious medical condition" within the meaning of the FMLA.

Even if such issues of fact remain, they are not material to the instant case because Ameren fired Hackney for violating its sick leave policy, not for exercising her FMLA rights.  "The FMLA is meant to prohibit employers from retaliating against employees who exercise their rights, refusing to authorize leave, manipulating positions to avoid application of the Act, or discriminatorily applying policies to discourage employees from taking leave." Callison v. City of Philadelphia, 430 F.3d 117, 120 (3rd Cir. 2005) (citing 29 C.F.R. § 825.220).  Therefore, "[i]nternal sick leave policies or any collective bargaining agreements are only invalidated to the extent they" undermine the rights guaranteed under the FMLA.  Id.

In the present case, Ameren's sick leave policy requiring employees on sick leave to remain home recuperating from their illnesses and not to

---

Haefling, 169 F.3d 494 (7th Cir. 1999).  Haefling is distinguishable from the present case.  The Seventh Circuit in Haefling determined that the plaintiff in that case who had aggravated a pre-existing neck injury while working did not have a "serious medical condition", because other than the plaintiff's self-serving assertions regarding the seriousness of the medical condition, the record was devoid of any evidence demonstrating that the plaintiff suffered from a "serious medical condition." Haefling, 169 F.3d at 500.  In the instant case, however, besides her own assertions that she needed medical treatment for her kidney stones because she was in a lot of pain, Hackney has also produced some evidence establishing that she received medical treatments due to her kidney stones and that she twice underwent a medical procedure for the condition during the time period at issue in this case.  See Dr. Roszhart's medical notes.  The Court is of the belief that, in viewing the facts in the light most favorable to Hackney, the record of evidence shows that there is at least an issue of fact as to whether Hackney's health condition rendered her unable to perform her regular daily activities.

23

engage in any recreational activities does not conflict with the substantive guarantees under the FMLA.  It further does not discourage Hackney from seeking benefits under the FMLA.  Ameren's sick leave policy simply ensures against employees abusing sick leave, regardless of whether the employee is taking FMLA leave.  See Callison, 430 F.3d at 120.

Moreover, the Seventh Circuit has stated that if the employer honestly suspects that an employee is not using her sick leave for its intended purpose, the employer has the right to discipline the employee, including discharging the employee, even if the employer's suspicion is incorrect. Kariotis v. Navistar International Transportation Corp., 131 F.3d 672, 681 (7th Cir. 1997); see Crouch v. Whirlpool Corporation, 447 F.3d 984, 986 (7th Cir. 2006)).  The regulations provide that, under the FMLA, an employee has "'no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  Kariotis, 131 F.3d at 681 (quoting 29 C.F.R. § 825.216(a)).  This means that because Ameren has the right to discharge Hackney for abusing the company's sick leave policy while on duty, it also has the right to fire Hackney for the same violation while she was on leave.  Id.; see Crouch, 447 F.3d at 986 (citing Kohls, 259 F.3d

at 804-05).

Hackney contends that the activities she engaged in were not "recreational activities" and Ameren's sick leave "policy that penalizes an employee for leaving the house, even if that activity is well within the restrictions imposed by the doctor" interferes with her entitlements under the FMLA.  Plaintiff's Response to Defendant's Motion for Summary Judgment (d/e 37) at 19.  Hackney's argument is not persuasive because Ameren has established that it had an honest belief that Hackney was misusing her sick leave, based on its surveillance of Hackney for several days and the time she spent at the family tavern and other places.  It is undisputed that Hackney ran various errands, including paying a ticket at the Christian County Courthouse and going to her family-owned tavern, a bank, a hardware store, a spa, and fast food stores.  Hackney further states in her Affidavit that she was "able to do more and more" and that "[she] was increasingly able to run errands" over the course of the following week after her surgery on February 19, 2004.  Hackney Aff., ¶¶ 13-14.  There is no evidence disputing that Ameren truly believed Hackney was abusing the sick leave policy.  Accordingly, Ameren was justified in terminating Hackney.

Hackney's main argument with respect to her interference claim is that Ameren's sick leave policy requiring employees on medical leave to remain home recuperating from their illnesses and to not engage in any recreational activities violates her substantive rights guaranteed under the FMLA. In support of her position, Hackney cites to <u>Jennings v. Mid-American Energy Co.</u>, a district court case within the Eight Circuit, for the proposition that a sick leave policy requiring employees on intermittent medical leave under the FMLA to "immediately return home, shut the blinds, and emerge only when prepared to return to work", violates the FMLA because "[s]uch a rule would be both unreasonable and impossible." <u>Jennings</u>, 282 F.Supp.2d 954, 961-62 (S.D. Ia. 2003). Hackney's reliance on <u>Jennings</u> is misplaced. The <u>Jennings</u> court specifically rejected the Seventh Circuit's "honest belief rule." <u>Id.</u> at 963. <u>Jennings</u>, thus, is not applicable to this case. Defendant is entitled to summary judgment on Hackney's interference claim under the FMLA.

THEREFORE, Defendant Ameren's Motion to Strike Portions of the Affidavit of Plaintiff Debra Hackney (d/e 41) is ALLOWED, in part, and DENIED, in part. Defendant's Motion for Summary Judgment (d/e 35) is ALLOWED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   July 27, 2006.

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE